**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-1545
_____

BRIAN McCAFFERTY; MELISSA A. McCAFFERTY,
individually and on behalf of their minor child, C.M.,

Appellants

v.

NEWSWEEK MEDIA GROUP, LTD.,
trading as Newsweek LLC, or Newsweek Inc., or Newsweek

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:18-cv-01276)
Chief District Judge: Honorable Juan R. Sánchez

_____

Submitted Under Third Circuit L.A.R. 34.1(a)
on November 15, 2020

Before: AMBRO, KRAUSE, and BIBAS, *Circuit Judges*

(Filed: April 14, 2020)

Dion G. Rassias
The Beasley Firm
1125 Walnut Street
Philadelphia, PA 19107

    *Counsel for Appellants*

Jeremy D. Mishkin
Montgomery McCracken Walker & Rhoads
1735 Market Street, 21st Floor
Philadelphia, PA 19103

    *Counsel for Appellee*

Eugene Volokh
UCLA School of Law
385 Charles E. Young Drive
Los Angeles, CA 90095

    *Counsel for Amicus Appellees*

————————————

## OPINION OF THE COURT

————————————

BIBAS, *Circuit Judge*.

Political discourse can be bruising. People often express opinions that offend others. But the First Amendment protects virtually all of those opinions, even offensive and hurtful ones, to promote a greater good: robust political discourse. The price of free speech is putting up with all sorts of name-calling and hurtful rhetoric.

C.M. is a politically vocal boy. He claims that a *Newsweek* article tarred him, at age twelve, by accusing him of "defending raw racism and sexual abuse." Appendix, *infra*, p. 12 (*Newsweek*'s pagination). But the article contained derogatory opinions based only on disclosed facts, which are not enough to show defamation or false light. Even if they could, C.M. does not plead facts showing actual malice, which the First Amendment requires of those who step into the political spotlight. So the District Court dismissed his claims, finding that no reasonable reader would think the article defamed him. We agree and will affirm.

## I. BACKGROUND

### A. Facts

During the 2016 presidential campaign, C.M. got a lot of attention. Before he had even turned twelve, he had publicly endorsed now-President Donald Trump and released videos seen by thousands. In one popular clip, C.M. called Hillary Clinton "deplorable." App. 64. That video went viral, attracting more than 325,000 views on Facebook alone. From Russian television stations to *Philadelphia* magazine, many wanted to hear from "Philly's Biggest Trump Supporter." App. 82–85.

C.M. obliged. In an interview with *Philadelphia* magazine, he said: "Madonna needs to leave the country. That would help make America great again. She's trash. She said she wanted to blow up the White House." App. 85. After being asked why his Facebook posts use "the same kind of vitriol" that C.M. had said "is tearing this country apart," he explained: "Look, it's

just a joke. They're calling Donald Trump a psychopath. They say he's mentally unfit. They're demonizing the Republican Party. They're saying most Republicans are racist. The people I talk about in these posts really have it coming to them." App. 84–85.

*Newsweek* noticed his popularity too. At the start of 2018, the magazine published an article titled "Trump's Mini-Mes." Appendix, *infra*, pp. 12–13. The article's subtitle described a girl named M.M.: "The alt-right deployed a 12-year-old Trump supporter to interview [Alabama Republican nominee] Roy Moore on the eve of the special Senate election. She's not the only kid in this weird little army[.]" *Id.* at 12. The top of the article featured a large photo of C.M. holding up a Trump campaign sign. And the fourth column displayed a photo of M.M. The caption next to C.M.'s picture read: "JUST KIDDING[:] Both [C.M.], left, and [M.M.], seen here with prime-time Fox News host Laura Ingraham, have gone viral with videos in which they tout all things Trump." *Id.* Here are the first two paragraphs in full:

> Watch [M.M.] or [C.M.], both of them 12, expound about their love of President Donald Trump and the platforms and candidates he endorses (most recently, [M.M.] deployed to Alabama for a cute-if-it-weren't-so-contextually-creepy interview with Senate candidate Roy Moore), and you'll notice that they both speak like Trump. And like him, they seem very comfortable in front of the cameras. Here's [M.M.] on Trump in a 2017 video interview with Jennifer Lawrence, vice president of the America

4

First Project, a populist-nationalist super PAC: "One of the other reasons I like him is because, and this is my favorite reason: 'We will build a waaaallll [sic] on our southern borders. And Mexico, no buts about it, Mexico will paaaay [sic] for the wall.'" Or [C.M.], to Infowars's Alex Jones, last October: "By the way, I saw your interview with Megyn Kelly; you got her good. You got her good. She thought she was going to make a fool of you, but you turned it around, and you proved her to be a liar."

Both instances demonstrate how Trump supporters are recruiting children as spokespeople. Jones, once he got done digressing to his 12-year-old guest about Kelly's hotness, hailed [C.M.] as part of the new wave of resistance to the "globalists"—a term the Anti-Defamation League considers an anti-Semitic dog whistle. "These kids are being weaponized," says Todd Gitlin, professor of journalism and sociology at Columbia University. He says the [M.M.] and [C.M.] interviews "camouflage" positions of the hard right "as feel-good sweetness and light, when, in fact, they are defending raw racism and sexual abuse."

*Id.* These were the only passages that named C.M., though seven other paragraphs named M.M.

The article quoted Professor Gitlin throughout. About halfway through, he said: "What I find repulsive is featuring children as spokespersons. That's hiding behind children."

Appendix, *infra*, p. 13. His quotations also appeared in the article's last two paragraphs:

> "These kids are reveling in the chance to show off," Gitlin says. "They're getting the chance to be little celebrities. If a kid is … reading chapter and verse a text written by somebody else, and is circumventing grown-up questions, then I think that's bait-and-switch politics.["]

> "There's a sinister quality to this. Kids are being seduced with the promise of being celebrities. In this case, the instigators are recruiting for a sort of boys' and girls' auxiliary, for what they believe to be a sacred crusade."

*Id.* We append a copy of this article to this opinion but have redacted C.M.'s and M.M.'s names and faces.

### B. Procedural history

After the article appeared in print, C.M.'s parents sued on his behalf, alleging that *Newsweek* had defamed C.M. and cast him in a false light.

The District Court granted *Newsweek*'s motion to dismiss. It reasoned that Professor Gitlin's statements at the end of the second paragraph did not defame C.M.; they faulted not kids, but adults on the "hard right." *McCafferty v. Newsweek Media Grp., Ltd.*, No. 2:18-cv-01276, 2019 WL 1078355, at *4 (E.D. Pa. Mar. 7, 2019). The Court read the other contested statements as non-actionable opinions. *Id.* at *4–5. And it held that C.M. had not adequately alleged "actual malice." *Id.* at *3 n.4, *6. That omission doomed both the false-light claim (for which

actual malice is an element) and the defamation claim (for which actual malice must be shown when the plaintiff is a public figure).

C.M. now appeals to us. We review the District Court's dismissal de novo, taking as true the facts alleged in C.M.'s complaint. *Carpenters Health & Welfare Fund of Phila. & Vicinity v. Mgmt. Res. Sys. Inc.*, 837 F.3d 378, 382 (3d Cir. 2016); *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012). As we are sitting in diversity, Pennsylvania law governs. Our job is to "predict how Pennsylvania's highest court would decide this case." *Berrier v. Simplicity Mfg., Inc.*, 563 F.3d 38, 45–46 (3d Cir. 2009).

## II.  *NEWSWEEK*'S STATEMENTS WERE NOT DEFAMATORY

"[F]undamentally, [defamation] is a state cause of action." *Marcone v. Penthouse Int'l Magazine for Men*, 754 F.2d 1072, 1077 (3d Cir. 1985). C.M. must thus prove that *Newsweek* "harmed [his] reputation within the meaning of state law." *Id.* (quoting *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 270 (3d Cir. 1980)).

Here, that state is Pennsylvania. So for his defamation claim, C.M. must plead seven elements: (1) that the statement was defamatory; (2) that *Newsweek* published it; (3) that the statement was about C.M.; (4) that readers would understand the statement as defamatory; (5) that readers would understand that the defamatory statement was about C.M.; (6) that the publication harmed him; and (7) that *Newsweek* lacked a "conditional[ ] privilege[ ]" to make that statement. *See* 42 Pa. Cons. Stat. § 8343(a).

7

The parties contest only the first and third elements. But we need resolve only the first element: whether the article's statements could be defamatory. While the parties spill much ink over whether key statements refer to C.M., we need not reach that issue, as C.M. must first show that the statements can carry a defamatory meaning. *See Graboff v. Colleran Firm*, 744 F.3d 128, 135 (3d Cir. 2014) (applying Pennsylvania law). He cannot. Every contested statement in *Newsweek*'s article is an opinion, label, or speculation based on disclosed facts and alleges no specific wrongdoing. Such statements cannot defame.

### A. The statements at the end of the second paragraph are non-actionable opinions or characterizations

1. *Pure opinions cannot defame*. As Pennsylvania courts recognize, pure opinions cannot be defamatory. Under the First Amendment, opinions based on disclosed facts are "absolutely privileged," no matter "'how derogatory'" they are. *Braig v. Field Commc'ns*, 456 A.2d 1366, 1373 (Pa. Super. Ct. 1983) (quoting 3 Restatement (Second) of Torts § 566 cmt. c (Am. Law Inst. 1977)) (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974)). That holds true even when an opinion is extremely derogatory, like calling another person's statements "anti-Semitic." *Jones v. City of Philadelphia*, 893 A.2d 837, 845 (Pa. Commw. Ct. 2006).

That privilege makes sense. When an article discloses the underlying facts, readers can easily judge the facts for themselves. *See Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985) (applying Pennsylvania law). *Newsweek*'s article did that here. So the opinions expressed in its article are privileged.

At the heart of this appeal is the first pair of quotations from Professor Gitlin, at the end of the article's second paragraph: "These kids are being weaponized" and "they are defending raw racism and sexual abuse." Appendix, *infra*, p. 12. Those characterizations follow the article's factual description of M.M.'s interviews with Roy Moore and Jennifer Lawrence, vice president of the America First Project, and C.M.'s interview with Infowars's Alex Jones. *Id.* Only after describing those interviews does the article offer Gitlin's opinion that "[t]hese kids are being weaponized" and that the "hard right" is using their interviews to "camouflage … defending raw racism and sexual abuse." *Id.*

But those characterizations make no factual claims about C.M. The article does not say that C.M. is a racist or sexual abuser. Nor does it accuse C.M. of having made any specific statements defending "raw racism and sexual abuse." Appendix, *infra*, p. 12. Instead, it quotes Gitlin's opinion about how the "hard right" is using C.M.'s and M.M.'s opinions. *Id.* His opinions may seem harsh, but that does not strip them of their absolute privilege.

Nor has C.M. shown that any of those opinions imply undisclosed facts. *See Veno v. Meredith*, 515 A.2d 571, 575 (Pa. Super. Ct. 1986) (noting that opinions are "actionable only if" they "'imply the existence of *undisclosed* defamatory facts'" (quoting *Beckman v. Dunn*, 419 A.2d 583, 587 (Pa. Super. Ct. 1980))). On the contrary, Gitlin's opinions relate back to the disclosed facts. Suggestions that kids are being "weaponized" as part of a "weird little army" that provides "spokespersons" are most naturally read as characterizing the facts of C.M.'s

and M.M.'s interviews. Appendix, *infra*, pp. 12–13. The phrase "defending raw racism and sexual abuse" is an opinion characterizing two disclosed facts. *Id.* at 13. "[S]exual abuse" naturally refers to M.M.'s "cute-if-it-weren't-so-contextually-creepy interview with Senate candidate Roy Moore"; as the article notes, Moore has been accused of sexual assault. *Id.* at 12–13. And "raw racism" characterizes C.M.'s interview with Alex Jones, in which Jones discussed " 'globalists'—a term the Anti-Defamation League considers an anti-Semitic dog whistle." *Id.* at 12. Even if these opinions are hyperbolic, they still characterize disclosed facts and are thus privileged.

2. *Nor can derogatory characterizations defame*. In any event, derogatory characterizations without more are not defamatory. Take accusations of racism. In Pennsylvania, "a simple accusation of racism" is not enough. *MacElree v. Phila. Newspapers, Inc.*, 674 A.2d 1050, 1055 (Pa. 1996). Rather, the accusation must imply more, by for instance suggesting that the accused has personally broken the law to "act[ ] in a racist manner." *Id.* For example, calling a district attorney "the David Duke of Chester County" could be actionable because it implied that he was unlawfully "abusing his power as the district attorney, an elected office, to further racism." *Id.* at 1054.

But Professor Gitlin alleged no specific, unlawful wrongdoing. While saying that someone committed a crime may be defamatory, publicly defending those accused of racism or sexual abuse is not unlawful. We see no evidence that Pennsylvania would let defenders of those accused of bigotry or crime bring defamation actions whenever a publication mentions their defense. *See Kryeski v. Schott Glass Techs., Inc.*, 626

A.2d 595, 601 (Pa. Super. Ct. 1993) (quoting W. Keeton et al., *Prosser and Keeton on the Law of Torts* § 111, at 776 (4th ed. 1984) ("A certain amount of vulgar name-calling is tolerated, on the theory that it will necessarily be understood to amount to nothing more.")). These characterizations cannot be defamatory.

### B. The other statements are non-actionable speculations or protected political characterizations

C.M. challenges a few of Professor Gitlin's other statements too: that C.M. may be a "spokesperson[ ]" for the "hard right," that he may be "reading chapter and verse a text written by somebody else," and that he is "being seduced with the promise of being [a] celebrit[y]." Appendix, *infra*, pp. 12–13. These statements do not name C.M. directly. But even if they do refer to him, they do not defame him.

Whether C.M. speaks for the "hard right" is "incapable of defamatory meaning" because it just describes C.M.'s "political … philosoph[y]." *Balletta v. Spadoni*, 47 A.3d 183, 199 (Pa. Commw. Ct. 2012). The other two statements are Professor Gitlin's speculations. Everyone is free to speculate about someone's motivations based on disclosed facts about that person's behavior. *See id.* at 197–99. "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993). Those statements are just more opinions based on disclosed facts, so they too are not actionable.

11

### III. C.M. ALSO FAILED TO PLEAD ACTUAL MALICE

Even if some statements in the *Newsweek* article were defamatory, C.M.'s claim fails because he did not plead actual malice. To show defamation, a public figure (even if just a "limited-purpose public figure" like C.M.) must show that the publisher acted with "actual malice." *Am. Future Sys., Inc. v. Better Bus. Bureau of E. Pa.*, 923 A.2d 389, 400 (Pa. 2007). "Actual malice" is a term of art that does not connote ill will or improper motivation. Rather, it requires that the publisher either know that its article was false or publish it with "reckless disregard" for its truth. *Id.* at 399 n.12. The First Amendment requires this demanding standard. *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964).

C.M. is a limited-purpose public figure. He "voluntarily inject[ed] himself" into the political controversies surrounding President Trump and the President's critics and enjoys "significantly greater access to the channels of effective communication" than his peers. *Am. Future Sys., Inc.*, 923 A.2d at 401 (quoting *Gertz*, 418 U.S. at 344, 351). One of C.M.'s videos has been watched hundreds of thousands of times, and news outlets both here and abroad have sought him out to discuss his political exploits.

So C.M. must plead actual malice. *Newsweek* does not admit that it "serious[ly] doubt[ed]" the truth of its article or knew that it likely contained false statements. *See* 3 Restatement (Second) of Torts, § 580A cmt. d (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Thus, to show actual malice, C.M. must use circumstantial evidence. *Joseph v. Scranton Times L.P.*, 129 A.3d 404, 437 (Pa. 2015).

C.M. cites three pieces of circumstantial evidence. First, he argues that *Newsweek* "grossly departed from professional journalistic standards" by not asking C.M. or his parents to comment for the article. Appellants' Br. 23. Second, he charges that *Newsweek* must have done so to improve its "declining and anemic sales and online hits." App. 7 (amended complaint). Third, he stresses that *Newsweek* put a large photo of C.M. at the top of the article. Even taken together, these facts fall well short of actual malice.

The District Court rightly discounted C.M.'s charges of subpar journalism. As then-Judge Alito explained, "even an extreme departure from professional standards, without more, will not support a finding of actual malice." *Tucker v. Fischbein*, 237 F.3d 275, 286 (3d Cir. 2001) (citing *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 665 (1989)); *see also Bartlett v. Bradford Publ'g, Inc.*, 885 A.2d 562, 567 (Pa. Super. Ct. 2005). "Likewise, a failure to investigate" Professor Gitlin's charges before publication, "standing alone, does not constitute actual malice." *Tucker*, 237 F.3d at 286. And *Newsweek*'s desire "to increase its profits" and sluggish sales does not make out actual malice either. *Harte-Hanks Commc'ns*, 491 U.S. at 667.

Lastly, printing a photo of C.M. says nothing about whether *Newsweek* doubted the truth of any of the facts in the article. The photo shows only that C.M. endorsed Donald Trump, a fact backed up by the article's first two paragraphs. The photo shows an energetic C.M. holding up a 2016 Trump campaign sign. That is all. Since the article profiled two young Trump

13

supporters, C.M. and M.M., it naturally included photos of both of them.

In sum, C.M. does not plead facts that suggest actual malice. He does not, for instance, plead that *Newsweek* made up Professor Gitlin's statements, used them to accuse him of breaking the law when it knew he was innocent, or published facts contrary to information it otherwise knew. We do not doubt that C.M. was disturbed by the publication. But "[a]ctual malice focuses on [*Newsweek*'s] attitude towards *the truth*," not towards him. *DeMary v. Latrobe Printing & Publ'g Co.*, 762 A.2d 758, 764 (Pa. Super. Ct. 2000) (emphasis added). Because he has not adequately pleaded actual malice, he may not use discovery to probe *Newsweek*'s state of mind. *See Tucker v. Phila. Daily News*, 848 A.2d 113, 130 (Pa. 2004); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009). So the District Court properly dismissed his defamation claim.

## IV. FOR THE SAME REASONS, C.M.'S FALSE-LIGHT CLAIM FAILS

C.M.'s false-light claim fares no better. Opinions based on true, disclosed facts cannot support a false-light claim unless they create a false impression. *Graboff*, 744 F.3d at 136–37 (citing *Larsen v. Phila. Newspapers, Inc.*, 543 A.2d 1181, 1189 (Pa. Super. Ct. 1988) (en banc)); *see also Krajewski v. Gusoff*, 53 A.3d 793, 806–07 (Pa. Super. Ct. 2012). In Pennsylvania, falsity means the same thing for false light as it does for defamation. *Graboff*, 744 F.3d at 137. In both contexts, an opinion based on disclosed facts cannot be false. *Petula v. Mellody*, 588 A.2d 103, 108 (Pa. Commw. Ct. 1991). And C.M. never tried

14

to show that any of Professor Gitlin's opinions referred to or implied facts that could be proven false.

Plus, the false-light tort requires actual malice. *See* 3 Restatement (Second) of Torts §652E; *Graboff*, 744 F.3d at 136 (noting that Pennsylvania follows the Second Restatement); *see also Krajewski*, 53 A.3d at 807–08, 810. C.M.'s failure to plead actual malice dooms this claim as well. So the District Court properly dismissed both claims.

\* \* \* \* \*

In the rough-and-tumble of politics, C.M. must endure offensive opinions and heated rhetoric. The First Amendment protects even the most derogatory opinions, because suppressing them would chill robust political discourse. As long as an opinion relies on disclosed facts, it is privileged. That is what happened here. And C.M. did not plead that *Newsweek* knew the facts were false or recklessly disregarded the truth. We will thus affirm.

**APPENDIX**

(A substantially identical article titled "Trump's Child Crusaders" appeared on the magazine's website, dated Dec. 13, 2017)





Photo of C.M.

POLITICS

# Trump's Mini-Mes

The alt-right deployed a 12-year-old Trump supporter to interview Roy Moore on the eve of the special Senate election. She's not the only kid in this weird little army

**JUST KIDDING** Both C.M. left, and M.M. seen here with prime-time Fox News host Laura Ingraham, have gone viral with videos in which they tout all things Trump.

↗ **WATCH** **M.M.** OR **C.M.**, both of them 12, expound about their love of President Donald Trump and the platforms and candidates he endorses (most recently, **M.M.** deployed to Alabama for a cute-if-it-weren't-so-contextually-creepy interview with Senate candidate Roy Moore), and you'll notice that they both speak like Trump. And like him, they seem very comfortable in front of the cameras. Here's **M.M.** on Trump in a 2017 video interview with Jennifer Lawrence, vice president of the America First Project,

BY

**GRAHAM LANKTREE**
🐦 @g_lanktree

a populist-nationalist super PAC: "One of the other reasons I like him is because, and this is my favorite reason: 'We will build a waaaallll on our southern borders. And Mexico, no buts about it, Mexico will paaaay for the wall.'" Or **C.M.** to Infowars's Alex Jones, last October: "By the way, I saw your interview with Megyn Kelly; you got her good. You got her good. She thought she was going to make a fool of you, but you turned it around, and you proved her to be a liar."

Both instances demonstrate how Trump supporters are recruiting children as spokespeople. Jones, once he got done digressing to his 12-year-old guest about Kelly's hotness, hailed **C.M.** as part of the new wave of resistance to the "globalists"—a term the Anti-Defamation League considers an anti-Semitic dog whistle. "These kids are being weaponized," says Todd Gitlin, professor of journalism and sociology at Columbia University. He says the **M.M.** and **C.M.** interviews "camouflage" positions of the hard right "as feel-good sweetness and light, when, in fact, they are defending raw racism and sexual abuse."

Both Republicans and Democrats use kids for political purposes, Gitlin adds. Before the 2016 election, **J.H.**, a 12-year-old from Florida who suffers from cerebral palsy, preprogrammed his computerized speech device to chant "Dump Trump" and "Trump mocks the disabled" and then hit Play at a Trump rally in Tampa. (He was booed by the crowd, and he and his family were escorted

FROM LEFT: MARIA YOUNG; JEFF MALET/NEWSCOM

out.) Days later, J.H. gained even more media attention when he met President Barack Obama (thanks to the intervention of a reporter) at a campaign event in Kissimmee.

But there is a big difference, Gitlin says, between demonstrating at rallies and being held up as political pundits in videos intended to go viral. "What I find repulsive is featuring children as spokespersons. That's hiding behind children." The younger they are, "the more [likely] they're being made use of in a fashion that is unseemly."

M.M.'s big break came last February at the 2017 Conservative Political Action Conference, where the America First Project published the video of her talking about Trump's wall, his positions on illegal immigration and how she believes teachers unions control American education. The video has earned nearly 750,000 views.

Several former Breitbart News employees started the America First Project, which also organized M.M.'s interview with Moore. One of them, Patrick Howley, told *The Atlantic* early this year that he quit Breitbart because he believed it had gone mainstream after Steve Bannon left the organization to run the Trump campaign in August 2016. During the campaign, Bannon characterized Breitbart as a platform for the so-called alt-right, a loose-knit group of nationalists, white supremacists and conspiracy theorists. Infowars's Jones caters to the alt-right in his politics and screeds. Howley described the America First Project as an "advocacy organization that is going to advocate for Trump administration policies that generally fall under a populist-nationalist window."

In his interview with M.M., Moore supported sending America's military to the U.S.-Mexico border to stop illegal immigration. He has also spoken against homosexuality.

Recently, he said the last time America was "great" was during slavery, and he has advocated for doing away with constitutional amendments against the institution. M.M. did not ask Moore about the sexual-assault accusations against him.

"The picture has been painted that M.M. does not have the ability to think for herself or that somehow she was forced into going to Alabama," America First's Lawrence says in an email to *Newsweek*. "To believe that takes away from the amazingly talented little girl that M.M. is and the force she brings to the entire political movement." M.M. did not respond to a request for an interview.

"She is better spoken and a better

> "What I find repulsive is featuring **children as spokespersons**. That's hiding behind children."



Photo of M.M.

interviewer than most people working for mainstream media outlets today," Lawrence adds. "We were contacted by M.M.'s father, Frank, about M.M. wanting to go to Alabama to campaign for Judge Roy Moore—someone who she met in the past—following the allegations that were brought against him by attorney Gloria Allred."

Allred represents Beverly Young Nelson, who says Moore sexually assaulted her while he was a district attorney in his 30s and she was 16. A woman named Leigh Corfman accuses Moore of assaulting her when she was 14. Multiple other women have shared stories about how Moore pursued them when they were teens.

"Besides what you see in the video, M.M. knocked on doors, phone-banked and attended church with Judge Moore and his family," Lawrence says, pointing out that "*alleged* is the key word" in the accusations against him.

Paul Begala, a longtime Democratic strategist, said M.M.'s interview with Moore is at best a case of very poor judgment by her handlers. "Words fail me," he said on CNN after the America First Project published the interview. "The fact that he's accused of sexually assaulting a 14-year-old girl and would sit down with a 12-year-old [girl], when he's not talking to any journalists..."

"These kids are reveling in the chance to show off," Gitlin says. "They're getting the chance to be little celebrities. If a kid is...reading chapter and verse a text written by somebody else, and is circumventing grown-up questions, then I think that's bait-and-switch politics.

"There's a sinister quality to this. Kids are being seduced with the promise of being celebrities. In this case, the instigators are recruiting for a sort of boys' and girls' auxiliary, for what they believe to be a sacred crusade." ◻