Filed 5/8/24

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ROSE BUI, | |
|     Plaintiff and Appellant, | G062338 |
|         v. | (Super. Ct. No. 30-2022-01257749) |
| NGO KY et al., | O P I N I O N |
|     Defendants and Respondents. | |

Appeal from a judgment of the Superior Court of Orange County, Richard Y. Lee, Judge. Reversed and remanded with directions.

Hoyt E. Hart II for Plaintiff and Appellant.

Mark S. Rosen for Defendants and Respondents.

\* \* \*

After defendants made certain statements on a YouTube broadcast about plaintiff and her family, at a time when plaintiff's husband was running for political

---

*        Pursuant to California Rules of Court, rule 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts III B through E of the Discussion.

office, plaintiff filed a defamation action against defendants which also alleged causes of action for intentional and negligent infliction of emotional distress. Plaintiff appeals from the trial court's grant of a special motion to strike her complaint pursuant to Code of Civil Procedure section 425.16,[1] the anti-SLAPP statute. She argues the court erred in concluding she was a limited purpose public figure who needed to demonstrate actual malice in conjunction with her defamation claim.

In the published portion of the opinion, focusing on the specific evidence that was before the trial court, we find the evidence did not demonstrate plaintiff was something other than a private figure for defamation purposes. That is, the totality of the circumstances did not demonstrate she thrust herself into the vortex of a public issue in an attempt to influence the outcome or that she assumed special prominence in the resolution of a public debate. In the remainder of the opinion, considering the proper standard and plaintiff's private figure status, we conclude plaintiff demonstrated the requisite minimal merit of her defamation claim, but she did not do so for her emotional distress claims. Accordingly, we reverse the judgment, direct the trial court to vacate its prior order, and direct it to enter a new order denying defendants' anti-SLAPP motion with respect to the defamation cause of action and granting it with respect to the remaining causes of action.

## FACTS

In May 2022, based on activities that took place earlier that year, plaintiff Rose Bui sued defendants Nam Quan and Ngo Ky for defamation, intentional infliction of emotional distress, and negligent infliction of emotional distress.[2] The complaint identified plaintiff as a Fountain Valley resident and a licensed attorney practicing in Orange County. It alleged defendants were both Orange County residents and further

---

[1] All further statutory references are to the Code of Civil Procedure, unless otherwise indicated.

[2] We refer individually to defendants by their last names, Nam and Ngo.

alleged Nam was "a YOUTUBE Channel personality whose videos primarily feature Vietnamese community gossip."

The full scope of actions allegedly engaged in by defendants were specified in the complaint as follows: "On or about February 13, 2022, Defendant [Nam] interviewed [Ngo] on his YouTube channel. During that interview Defendants said and implied that they knew the family of [plaintiff], that she [(plaintiff)] was the daughter of a Commander of the Communist Party regime, [and] that her husband's family and relatives were all communists. Defendants identified [plaintiff's] father as 'Vu Thanh', a high ranking communist leader, a Commander, and published several photos of an older man in a communist uniform, confirmed by Defendant NGO KY as [plaintiff's] father. Defendants further claimed that during the 2022 Tet parade, that [plaintiff] and several friends all wore red with yellow hats, just like the communist regime's flag, and that they danced and played communist music all along Bolsa Ave."

According to the complaint, these statements were false. It elaborated: "[Plaintiff's] father was a civil engineer who retired in 2000. He never participated in the military. The man in uniform photo does not show [plaintiff's] father. [Plaintiff] never participated or was involved with the Communist Party. [Plaintiff] wore a red dress, symbolic of the Lunar new year, in the Tet parade. The music played was Vietnamese pop music for the young people to dance to. It was not communist music."

Defendants responded to the complaint by filing a demurrer and a special motion to strike pursuant to the anti-SLAPP statute. The anti-SLAPP motion contended plaintiff's claims were based on protected activity under section 425.16, subdivisions (e)(3) and (e)(4), because the statements allegedly made by defendants (1) were "made in a place open to the public or a public forum in connection with an issue of public interest," and (2) amounted to "conduct in furtherance of the exercise of . . . the constitutional right of free speech in connection with a public issue or an issue of public interest." Defendants also asserted plaintiff would be unable to demonstrate the minimal

3

merit of her claims because she was a public figure who could not prove the statements were made with malice, she could not demonstrate provable falsity, and defendants' activities could not be the basis of liability due to protections set forth in the Communications Decency Act of 1996 (47 U.S.C., § 230; section 230).

To support their arguments, defendants submitted two declarations. The first was from Ngo, who described himself as a political activist in the Orange County Vietnamese-American community since 1984. He explained that he appears almost weekly on Trust Media Network, a social media channel on YouTube, to discuss political issues. When he did so on February 13, 2022, the last five minutes of the show concerned the political campaign of Ted Bui, who was running for State Assembly at the time. According to Ngo, he saw a Facebook post five days prior which included the following: photos of Ted Bui and his wife carrying political posters for his campaign in a Tet (lunar new year) parade; "[p]hotos of a man in a Vietnam communist army official colonel uniform identified as Lan Vu's father, Mr. Thanh Vu;" a statement that Lan Vu was Ted Bui's wife; and a video of Ted Bui and his wife wearing red clothing and yellow head dresses, consistent with the colors of the Vietnamese flag, while dancing on a Westminster street "to Vietnam communist music."[3] Ngo felt compelled to share this information with the community because voters were determining how to cast their votes in the upcoming election and he believed "Vietnamese-American refugees and their immigrant family members most likely [would] not cast a vote for anyone who is affiliated in any way with the Vietnam communist organization." When he learned two weeks later from the owner of the Facebook account that Thanh Vu is actually plaintiff's uncle, plaintiff's father is Chung Vu, and the person had dubbed communist music into the video depicting plaintiff and Ted Bui dancing, Ngo corrected the information in another appearance on Trust Media Network.

---

[3]     A separate declaration clarified plaintiff also goes by the name Lan Vu, a statement with which plaintiff appears to agree. For clarity, we refer to her as plaintiff.

4

Attached to Ngo's declaration was a transcript of a portion of the February 2022 YouTube broadcast.[4]  After showing the audience a video and criticizing Ted Bui for walking in the Tet parade, which Ngo described as a cultural event, with a campaign banner, Ngo went on to discuss Ted Bui's family.  He stated, "We don't know much about his familial background, but on his wife's side . . . His wife is . . . uh uh . . . what . . . Bui . . . what . . . uh . . . Lan Vu is a lawyer or something, a daughter of a Communist colonel guy, a senior member of the Communist Party of Vietnam.  Colonel.  It's . . . there's the picture for you to see.  There you see, that's the father of Vu Lan, the wife of this guy Ted Bui.  Ted Bui's father-in-law.  His father-in-law is a Communist colonel."  Ngo proceeded to describe Ted Bui's supposed prior activity in France of "follow[ing] some Socialist Communist party."  He then showed the audience an additional image stating, "There, you see, look at that image, the father-in-law and all Communist relatives."

Ngo continued during the broadcast:  "All of a sudden, a son-in-law of a Communist colonel is now running for election and approaching the community and so on.  Therefore, we need to unmask them, we're saying that Ted Bui, a Fountain Valley city councilman and now running for state assemblyman is a guy connected with the Communists, his wife is a lawyer . . . Is that Lan Vu?  Lan Vu, something Vu Lan, daughter of a Communist colonel.  Here, look at see the picture, folks.  When we say something we do have proofs [sic].  But just recently you see that during the parade he brought along a group of people wearing red outfits, red clothes and yellow hats, like the Communist flag, dancing and spinning on Bolsa Avenue, playing communist music and all.  So, I warn you, I caution you about Ted Bui so you can be cautious about this guy, OK?"

The second declaration was from Michael Vo, a resident of, and city councilmember for, Fountain Valley.  He explained that he and his wife had become close

---

[4]        The original broadcast was in Vietnamese.  The transcript provides both the original Vietnamese and an English translation performed by a certified court interpreter.

friends with Ted Bui and plaintiff while engaged in political and business activities. Among other things, Vo and Ted Bui assisted each other in running successful city council campaigns. Vo described a day in 2021 when plaintiff's father, Chung Vu, "spontaneously shared about his past and what he achieved in Vietnam." He conveyed Chung Vu "shared his opinion about the Vietnam communist party" and told him "he was an officer in the Vietnam communist government[,]" although Vo could "not recall the exact details of when or how."

Plaintiff opposed the anti-SLAPP motion. She contended her claims were not subject to the anti-SLAPP statute because defendants' comments did not concern a public controversy or an issue of public interest. From her perspective, they were personal attacks on her and she was not a person in the limelight simply because she was married to a local elected official with whom she appeared in public. Plaintiff also argued her cause of action had minimal merit, rejecting defendants' assertion she was a public figure who needed to prove actual malice.

The only evidence presented by plaintiff was her own three paragraph declaration. The first paragraph was introductory. The second paragraph stated she saw the February 2022 YouTube broadcast and identified things defendants said and did during it. The third paragraph asserted all defendants' comments were false, further explaining as follows: "Communist associations or sympathies in the Vietnamese expatriate community will subject a person so charged to hatred, contempt, ridicule, and shame. My father was a civil engineer who retired in 2000. He never participated in the military. The man in the photo is not my father. I have never participated in, involved with [sic], or supported the Communist party. The red dress I wore at the TET parade was symbolic of the lunar new year. The music played was Vietnamese pop music for the young people to dance to. It was not Communist music."

6

After considering the evidence and the parties' arguments, the trial court granted the anti-SLAPP motion.[5]  In its written order, the court first explained it found defendants met their initial burden of establishing applicability of the anti-SLAPP statute. Citing section 425.16, subdivision (e)(4), it outlined evidence demonstrating that defendants' alleged conduct was in connection with a public issue or an issue of public interest — Ted Bui's political campaign and his qualifications for public office, particularly from the perspective of the local Vietnamese-American community.  Second, the court analyzed whether plaintiff met her burden of establishing the minimal merit of her claims.  Focusing on the defamation cause of action, with a note that plaintiff did not address the other claims, it concluded she failed to do so.  From its perspective, there was sufficient evidence the targeted statements were false statements of fact.  In contrast, it found plaintiff failed to produce any evidence of actual malice, an element it deemed necessary based on its conclusion she qualified as a limited purpose public figure.  Part of what led the court to conclude she was such a figure was that she carried political posters for her husband's campaign during the Tet parade while wearing "the current colors of Vietnam's flag."

Prior to appealing, plaintiff moved the trial court to reconsider its ruling. Her motion was based on two "new or different facts" and one "new or different law": (1) "[p]laintiff was not carrying any political poster for her husband's campaign in the 2022 lunar new year Tet parade"; (2) "[r]ed and yellow, the colors worn by [p]laintiff while walking beside her husband in the 2022 lunar new year Tet parade, are the colors of the flag of the Republic of Vietnam, the formerly democratic South"; and (3) "[m]ere involvement of [a] person in a matter which media deems to be of interest to [the] public does not, in and of itself, require that such person become [a] public figure for purpose[s] of [a] subsequent libel action."

---

[5]        Due to its action on the anti-SLAPP motion, the court concluded defendants' demurrer to the complaint was moot and did not rule on it.

Plaintiff supported her motion with a declaration nearly identical to her prior one, with just one additional paragraph added. It stated: "I never carried any political posters in the 2022 Tet parade. Attached hereto are three (3) photos from the 2022 Tet parade showing that neither my husband or myself carried any political poster. As a practicing attorney, I am very careful not to involve myself in political discussions generally and as to my husband's political positions specifically, and I did not do so during the 2022 Tet parade."

Defendants opposed the reconsideration motion, characterizing it as seeking "a second bite at the apple." They asserted plaintiff's "new" evidence and law was all available to her at the time she opposed the anti-SLAPP motion, so it could not justify reconsideration. At the same time, they presented their own additional evidence via a declaration from Ngo and cited one additional case they had not previously brought to the court's attention.

The trial court denied plaintiff's motion. It found there was no explanation for why plaintiff's "new" facts were not, or could not, be presented in connection with her opposition to defendants' anti-SLAPP motion. It also noted the one case plaintiff cited as "new" law was 38 years old and the court was previously aware of it because plaintiff cited it in her anti-SLAPP opposition papers.

The trial court entered judgment in defendants' favor. Plaintiff timely appealed from the order granting defendants' anti-SLAPP motion and the ensuing judgment.[6]

## DISCUSSION

Plaintiff contends the trial court erred in finding she was a limited purpose

---

[6] Plaintiff's notice of appeal also indicated she was appealing from the order denying her reconsideration motion. However, such an order is not separately appealable; it is reviewable on appeal from the underlying order for which she sought reconsideration and from which she timely appealed. (§ 1008, subd. (g).)

8

public figure for defamation purposes.  On this basis alone, she asks we reverse the court's ruling and remand the case for trial.  Although, as we explain below, we agree the evidence did not demonstrate plaintiff was a limited purpose public figure, and thus the trial court erred in granting defendants' motion due to plaintiff's failure to present evidence of actual malice, our analysis of the merits of the motion does not end there.  Taking the necessary further step to determine whether plaintiff met her burden of showing minimal merit of her claims, we conclude she did as to the defamation claim only.

I.        *Anti-SLAPP Legal Principles and Standard of Review*

"The Legislature enacted section 425.16 in response to 'a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances.'"  (*Rand Resources, LLC v. City of Carson* (2019) 6 Cal.5th 610, 619.)  The special motion to strike provided for in the statute is "'intended to resolve quickly and relatively inexpensively meritless lawsuits that threaten free speech on matters of public interest.'"  (*Ibid*.)  By legislative direction, the statute is to "be construed broadly."  (§ 425.16, subd. (a).)

"Litigation of an anti-SLAPP motion involves a two-step process.  First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant has engaged.'"  (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1009 (*Bonni*).)  The statute sets forth the four categories of protected activity.  (§ 425.16, subd. (e).)

"Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit."'"  (*Bonni, supra*, 11 Cal.5th at p. 1009.)  This step of the anti-SLAPP analysis "has been described as a summary-judgment-like procedure.  [Citation.]  The court determines whether '"the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to

9

sustain a favorable judgment.'" [Citation.] The plaintiff "'may not rely solely on its complaint, even if verified; instead, its proof must be made upon competent admissible evidence.'" [Citation.] The defendant may submit evidence in support of its motion. [Citation.] However, "'[t]he court does not weigh evidence or resolve conflicting factual claims.'" [Citation.] Rather, the court "'accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law. [Citation.] '[C]laims with the requisite minimal merit may proceed.'"'" (*Billauer v. Escobar-Eck* (2023) 88 Cal.App.5th 953, 962 (*Billauer*).) Conversely, "[i]f the plaintiff cannot make this showing, the court will strike the claim." (*Bonni,* at p. 1009.)

"On appeal, we review [an anti-SLAPP] motion de novo and independently determine whether the parties have met their respective burdens." (*Cross v. Cooper* (2011) 197 Cal.App.4th 357, 371.) We employ the same two-step process used by the trial court. (*Billauer, supra*, 88 Cal.App.5th at p. 962.) "'Only a [claim] that satisfies *both* prongs of the anti-SLAPP statute — i.e., that arises from protected speech or petitioning *and* lacks even minimal merit — is a SLAPP, subject to being stricken under the statute.'" (*Ibid*.)

II.     *Protected Activity*

The trial court concluded defendants' alleged actions described in the complaint constitute activity protected by the anti-SLAPP statute. Plaintiff does not challenge this aspect of the court's ruling, instead she focuses her argument on the "minimal merit" second prong. Thus, we presume defendants made the requisite first-prong showing and similarly focus on the second prong. (See *Balla v. Hall* (2021) 59 Cal.App.5th 652, 671 (*Balla*) [appellant bears burden of affirmatively demonstrating error even when standard of review is de novo]; see, e.g., *San Diegans for Open Government v. San Diego State University Research Foundation* (2017) 13 Cal.App.5th

76, 106, fn. 17 [appellant waived challenge to one aspect of trial court's ruling concerning applicability of anti-SLAPP statute by failing to address it in opening brief].)

III.        *Probability of Prevailing on the Merits*

The complaint alleged three causes of action against defendants: (1) defamation; (2) intentional infliction of emotional distress; and (3) negligent infliction of emotional distress.  Plaintiff, both below and on appeal, devotes all her energy to the defamation cause of action.  By failing to provide any evidence or argument on the other two causes of action, she failed to meet her burden of demonstrating the minimal merit of those claims.  Accordingly, we must affirm the trial court's order in that respect and limit our further consideration to the defamation cause of action.

Libel, which plaintiff alleges, "is a type of defamation based on written or depicted communication." (*Balla, supra*, 59 Cal.App.5th at p. 675.)  "'"'The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage.'"'" (*Hoang v. Tran* (2021) 60 Cal.App.5th 513, 531-532 (*Hoang*).)  In *New York Times Co. v. Sullivan* (1964) 376 U.S. 254, the Supreme Court explained that federal constitutional principles require persons who qualify as public officials or public figures to prove an additional element — that the communication was made with actual malice. (*Id*. at pp. 270-280.)  Private plaintiffs, in contrast, need only show negligence.

A.        *Limited Purpose Public Figure*

We begin with the biggest point of contention between the parties.  Plaintiff argues the trial court erred in concluding she was a limited purpose public figure who needed to prove actual malice.  She asserts she "did nothing to inject herself into any public controversy" and did not attempt to influence the outcome of any public discussion, controversy, or debate.  Defendants disagree, arguing that "[i]n a political campaign, everything a spouse does becomes grist for the mill."  We conclude the limited

11

record in this case was insufficient to establish plaintiff as someone other than a private figure.

"The federal Constitution's First Amendment, made applicable to the states by the Fourteenth Amendment [citation], guarantees freedom of speech and of the press. In *New York Times Co.* v. *Sullivan . . .* , the United States Supreme Court for the first time construed these constitutional guarantees as imposing limitations on a state's authority to award damages for libel. Specifically, the court held that the First Amendment 'prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with "actual malice" — that is, with knowledge that it was false or with reckless disregard of whether it was false or not.' . . . In *Curtis Publishing Co. v. Butts* (1967) 388 U.S. 130, 134 . . . the high court held that this 'actual malice' requirement for defamation actions brought by public officials applied also to defamation actions brought by 'public figures.'" (*Khawar v. Globe Internat., Inc.* (1998) 19 Cal.4th 254, 262-263 (*Khawar*).)

The rationale for the distinction between public and private figure defamation plaintiffs is twofold. First, public figures "invite attention and comment" as a necessary consequence of their voluntary assumption of a prominent, persuasive, or influential role in public affairs. (*Gertz v. Robert Welch, Inc.* (1974) 418 U.S. 323, 344-345 (*Gertz*).) Second, public officials and public figures have "greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy." (*Id*. at p. 344.)

Over time, courts clarified there are two general types of public figure individuals. Those who "achieve such pervasive fame or notoriety" are "public figure[s] for all purposes and in all contexts." (*Gertz, supra*, 418 U.S. at p. 351.) In contrast, those who voluntarily inject themselves or are drawn into a particular public controversy become public figures for a limited range of issues. (*Ibid*.) These latter types of

12

individuals are often referred to as limited purpose public figures.  (*Khawar, supra*, 19 Cal.4th at p. 263.)

Three elements must be present to characterize someone as a limited purpose public figure.  (*Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577.)  "First, there must be a public controversy, which means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants.  Second, the plaintiff must have undertaken some voluntary act through which he or she sought to influence resolution of the public issue."  (*Ibid*.)  In this regard, the critical focus is the "'nature and extent of an individual's participation in the particular controversy giving rise to the defamation.'"  (*Wolston v. Reader's Digest Assn., Inc.* (1979) 443 U.S. 157, 167 (*Wolston*).)  Although, "[h]ypothetically, it may be possible for someone to become a public figure through no purposeful action of [their] own," the Supreme Court has cautioned "the instances of truly involuntary public figures must be exceedingly rare." (*Gertz, supra*, 418 U.S. at p. 345.)  "And finally, the alleged defamation must be germane to the plaintiff's participation in the controversy.  (*Ampex,* at p. 1577.)

The public figure inquiry is one of law.  (*Khawar, supra*, 19 Cal.4th at p. 264; *Reader's Digest Assn., Inc. v. Superior Court* (1984) 37 Cal.3d 244, 252.)  We review the trial court's resolution of disputed factual issues relevant to the public figure determination for substantial evidence and the court's conclusion on the question of public figure status de novo.  (*Khawar,* at p. 264.)

Defendants argue the relevant public controversy was the election and the candidates.  We agree an election in which various people are vying for public office, including the respective qualifications of each candidate, amounts to a public debate or controversy.  (See *Annette F. v. Sharon S.* (2004) 119 Cal.App.4th 1146, 1164 (*Annette F.*) [issue being debated publicly that has foreseeable and substantial ramifications for nonparticipants is public controversy].)  In this case, the debate specifically concerned the 2022 local State Assembly race and Ted Bui's related campaign.

13

Where we diverge from defendants' proffered analysis is the next step, which concerns plaintiff's involvement in the debate. From defendants' perspective, "[a] candidate does not run in isolation; in making [the decision to run for office] he or she brings the candidate's family into the public eye." To the extent this is an urge for us to find any political candidate's family members to be limited purpose public figures simply by reason of the candidate's choice to run for public office, we decline to so hold. Defendants do not point us to any authority for such a broad sweeping rule.[7] Moreover, doing so would effectively turn family members of a political candidate, including children, into public figures through no purposeful action of their own. The Supreme Court has cautioned that the finding of such involuntary public figure status "must be exceedingly rare." (*Gertz, supra*, 418 U.S. at p. 345.) We find no justification for the families of political candidates, generally, to be one of those "exceedingly rare" instances. (*Ibid*.; see *Wolston, supra*, 443 U.S. at p. 168 [private individual not transformed into public figure by becoming involved in or associated with matter that attracts public attention]; *Khawar, supra*, 19 Cal.4th at p. 265 [involuntary public figure characterization reserved "for an individual who, despite never having *voluntarily* engaged the public's attention in an attempt to influence the outcome of a public controversy, nonetheless has acquired such public prominence in relation to the controversy as to permit media access sufficient to effectively counter media-published defamatory statements"].)

---

[7] To support their argument, defendants cite cases discussing whether something is a matter of public concern for purposes of determining applicability of the anti-SLAPP statute. (*Sandlin v. McLaughlin* (2020) 50 Cal.App.5th 805, 825; *Sonoma Media Investments, LLC v. Superior Court* (2019) 34 Cal.App.5th 24, 35-36 (*Sonoma*); *Vogel v. Felice* (2005) 127 Cal.App.4th 1006, 1015; *Conroy v. Spitzer* (1999) 70 Cal.App.4th 1446, 1451.) They also extensively quote a case which predated *Gertz*, did not involve a public figure analysis, and which concerned an alleged invasion of privacy, a tort which the Supreme Court in the same opinion said was distinct from libel. (*Kapellas v. Kofman* (1969) 1 Cal.3d 20, 35.)

Heeding the Supreme Court's direction to focus on the nature and extent of plaintiff's particular involvement in the 2022 election related issues (*Wolston, supra*, 443 U.S. at p. 167), we turn to the evidence that was before the trial court at the time it considered the anti-SLAPP motion.[8]  The sole evidence on this point, which was undisputed by plaintiff at the time, was as follows:  photos posted by a third party on Facebook depicted Ted Bui and plaintiff carrying political posters for his campaign during a 2022 lunar new year parade, which was a cultural event organized by a nonprofit.

The one-time carrying of a campaign poster with an unknown message by the wife of a political candidate at a cultural event, standing alone, does not amount to the type of voluntary injection in a public controversy at which the limited purpose public figure jurisprudence is aimed.  We take guidance from precedent which exemplifies what it means to "thrust [oneself] into the vortex of [a] public issue," to "assume special prominence in the resolution of [a] public question[]," to "engage the public's attention in an attempt to influence [the] outcome," and to "voluntarily inject[] [oneself] . . . into a particular public controversy."  (*Gertz, supra*, 418 U.S. at pp. 351-352)

In *Time, Inc. v. Firestone* (1976) 424 U.S. 448 (*Firestone*), the United States Supreme Court considered whether the wife of "the scion of one of America's wealthier industrial families" was a limited purpose public figure in relation to her divorce from her husband.  (*Id*. at pp. 450, 453.)  Although the wife held a few press conferences "in an attempt to satisfy inquiring reporters," the court found she was not a public figure.  (*Id*. at pp. 454-455, & fn. 4.)  It explained, she did not "choose to publicize issues as to the

_____

[8]        We do not consider any of the evidence offered by plaintiff or defendants in conjunction with plaintiff's motion for reconsideration.  Having reviewed such evidence, it is clear it all would have been available at the time of the anti-SLAPP motion and neither side explained why they failed to previously present it.  (§ 1008, subd. (a); *Shiffer v. CBS Corp.* (2015) 240 Cal.App.4th 246, 255 [in reconsideration context, party must provide satisfactory explanation for failure to produce new evidence at earlier time].)

15

propriety of her married life," she was compelled by state law to go to court to obtain a divorce, and there was no evidence the media interviews were done to impact the resolution of the legal dispute with her husband. (*Ibid*.)

Our state high court came to the same conclusion in *Khawar, supra*, 19 Cal.4th 254, which involved a photojournalist who was photographed on a podium near a famous politician who was assassinated moments later. (*Id*. at p. 260.) Approximately 20 years later, a book used the photograph to promulgate the theory that the plaintiff was the assassin, a story which was republished by a tabloid newspaper. (*Id*. at pp. 259-260.) The court concluded the plaintiff was not a limited purpose public figure. (*Id*. at pp. 267-268.) It noted he was not a suspect, did not testify at trial, did not publicize his views on the assassination, and did not have media access. (*Id*. at pp. 265-266.) Although plaintiff hoped standing next to the candidate would get him photographed for personal souvenir purposes, the court explained that "a journalist who is photographed with other journalists crowded around a political candidate does not thereby assume any special prominence in relation to the political campaign issues." (*Id*. at 267.) There was no evidence the plaintiff "'engaged the attention of the public *in an attempt to influence* the resolution of the issues involved.'" (*Ibid*.)

In contrast to *Firestone* and *Khawar* stands *Annette F., supra*, 119 Cal.App.4th 1146. There, the plaintiff was one half of a same-sex couple who purposefully solicited public and media attention regarding their civil commitment ceremony. (*Id.* at p. 1164.) The couple set up a Web site to publicize it and to provide information about same sex marriage and second parent adoptions. (*Ibid*.) They later willingly participated in a nationally televised show on same sex marriage and second parent adoption efforts which received extensive press. (*Ibid*.) The plaintiff viewed herself and her partner as "'advocates for the civil rights of gay and lesbian people.'" (*Ibid*.) After the couple split, plaintiff thrust herself to the forefront of, and spoke to the press about, a legal battle with her former partner regarding second parent adoption of a

16

child to which her former partner had given birth. (*Id*. at pp. 1156-1157, 1165.) Based on these activities, the appellate court concluded, plaintiff's "purposeful activities in drawing public attention to her relationship with [her former partner] in order to promote gay marriage and second-parent adoptions, and portraying the . . . litigation as a battle to protect the rights of gay and lesbian parents and their children, made her a limited purpose public figure on the subject matter of the litigation." (*Id*. at p. 1165.)

Other California appellate courts have reached similar conclusions in cases involving publicly active and vocal plaintiffs. In *Balla*, the plaintiff was a land developer's representative who presented at public workshops and met with the selection committee for a major public project while actively seeking the contract for it. (*Balla, supra*, 59 Cal.App.5th at pp. 676-677.) *Gilbert v. Sykes* (2007) 147 Cal.App.4th 13, 25, involved a doctor who "ha[d] thrust himself into [the] debate [about the relative merits of plastic surgery] by appearing on local television shows as well as writing numerous articles in medical journals and beauty magazines, touting the virtues of cosmetic and reconstructive surgery." In *Nadel v. Regents of University of California* (1994) 28 Cal.App.4th 1251, 1269-1270, the plaintiff opposed a city park project by speaking publicly at city council meetings and demonstrations, writing to a local newspaper and the city, appearing on six radio programs, speaking to print media who included his comments in articles, and staffing a weekly information table in the park. And, in *Rudnick v. McMillan* (1994) 25 Cal.App.4th 1183, 1190, the plaintiff publicly expressed concern over a public land preserve on which he grazed cattle and invited reporters to visit the preserve in hopes they would write articles about him and the preserve's condition.

Voluntary active influencing of public matters has also been a defining characteristic in federal court determinations. For example, in *McCafferty v. Newsweek Media Group, Ltd.* (3d Cir. 2020) 955 F.3d 352, the plaintiff was a "politically vocal" 12-year-old who supported a candidate for President of the United States. (*Id*. at p. 355.)

The Third Circuit Court of Appeals found the plaintiff to be a limited purpose public figure, persuaded by evidence showing he voluntarily injected himself in controversies surrounding the candidate's campaign and the candidate's critics, he released videos on social media which garnered thousands of views, and media outlets around the world "sought him out to discuss his political exploits." (*Id*. at p. 359.)

The Eighth Circuit Court of Appeals was similarly swayed in *United States v. Sryniawski* (8th Cir. 2022) 48 F.4th 583, 588, which included evidence the wife of a political candidate "was actively involved in [her husband's] campaign" and at one point had served as his campaign manager. As support, it cited two state court decisions involving "spouses of candidates for public office who [were] actively involved in the campaign." (*Id*. at p. 588, citing *Krueger v. Austad* (S.D. 1996) 545 N.W.2d 205, 212 [wife of political candidate was his campaign advisor, "one of [his] most enthusiastic supporters," actively participated in campaign, and allowed her endorsement and photograph to be used in campaign literature], and *Burns v. Times Argus Assn., Inc.* (Vt. 1981) 430 A.2d 773, 775 [wife of lieutenant governor made conspicuous public appearances during his gubernatorial campaign and handed out leaflets and posters in order to affect outcome]; see also *Hemenway v. Blanchard* (Ga.Ct.App. 1982) 294 S.E.2d 603, 605-606 [husband of congressional candidate who actively participated in wife's news conferences, at times talking more than she did, in attempt to influence outcome in her favor].)

On the record before us, we find plaintiff to be more like the private plaintiffs in *Firestone* and *Khawar*, than the limited purpose public figure plaintiffs in *Annette F.* and the remaining cases. Evidence of her one-time participation in a lunar new year parade alongside her husband while carrying a campaign sign with an unknown message can, at most, be characterized as "[t]rivial or tangential participation" which does not divest a person of their private person status. (*Waldbaum v. Fairchild*

18

*Publications, Inc.* (D.C. Cir. 1980) 627 F.2d 1287, 1297; see *Gertz, supra*, 418 U.S. at pp. 344-345, 351-352.)

In so concluding, we acknowledge "the constitutional guarantee [of free speech] has its fullest and most urgent application . . . to the conduct of campaigns for political office." (*Buckley v. Valeo* (1976) 424 U.S. 1, 15.) "Thus, those engaged in political debate are entitled not only to speak responsibly but [also] to '. . . speak foolishly and without moderation.'" (*Desert Sun Publishing Co. v. Superior Court* (1979) 97 Cal.App.3d 49, 52.)

But there are recognized limitations because "'[a] reasonable degree of protection for a private individual's reputation is essential to our system of ordered liberty.'" (*Khawar, supra*, 19 Cal.4th at p. 273.) The precise scope of the limited purpose public figure category is somewhat amorphous. "One [federal] district court opined that the task of demarcating between public and private figures 'is much like trying to nail a jelly fish to the wall.'" (*Marcone v. Penthouse Intern. Magazine for Men* (3d Cir. 1985) 754 F.2d 1072, 1082, fn. omitted, quoting *Rosanova v. Playboy Enterprises, Inc.* (S.D.Ga. 1976) 411 F.Supp. 440, 443, affd. (5th Cir. 1978) 580 F.2d 859.) However, because the evaluation hinges on the specific facts and totality of the circumstances in each case (*Wolston, supra*, 443 U.S. at p. 167), we need not fully define the bounds of the doctrine, and we do not attempt to do so. Rather, we simply conclude the facts presented to the trial court in relation to the anti-SLAPP motion in this case do not demonstrate plaintiff is a limited purpose public figure. Accordingly, plaintiff did not need to show actual malice.

B.  *False Statement of Fact*

"'The *sine qua non* of recovery for defamation . . . is the existence of falsehood.'" (*Sonoma, supra,* 34 Cal.App.5th at p. 42.) "'Though mere opinions are generally not actionable,' a 'statement that implies a false assertion of fact is actionable.' [Citations.] "'[I]t is not the literal truth or falsity of each word or detail used in a

19

statement which determines whether or not it is defamatory; rather, the determinative question is whether the 'gist or sting' of the statement is true or false, benign or defamatory, in substance.""" (*Balla, supra*, 59 Cal.App.5th at pp. 677-678.)

"'To decide whether a statement is fact or opinion, a court must put itself in the place of an average reader and determine the natural and probable effect of the statement, considering both the language and the context.'" (*Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 698-699 (*Summit Bank*).) The critical question is "'whether a reasonable fact finder could conclude the published statement declares or implies a provably false assertion of fact.'" (*Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 385, citing *Milkovich v. Lorain Journal Co.* (1990) 497 U.S. 1, 19.) Thus, couching statements in terms of opinion does not necessarily make the statements nonactionable. (*Franklin,* at p. 385.) And, what may present as a statement of opinion in one context, may constitute a statement of fact in another. (*Summit Bank,* at p. 698.) In each case, we look to the totality of the circumstances to determine whether the requisite factual imputation is present. (*Balla, supra*, 59 Cal.App.5th at p. 678; *Franklin,* at pp. 385-386.) The question is ordinarily one of law. (*Balla,* at p. 678.)

The statements and implications targeted by plaintiff's complaint, as clarified by evidence submitted by the parties in conjunction with the anti-SLAPP motion, were the following: that a person who marched in the lunar new year parade wearing a Vietnamese Communist military uniform was plaintiff's father; that she was the daughter of "a senior member of the Communist Party of Vietnam"; that all their family members in the parade were Communists; and that they wore Communist colors and danced to Communist music during the parade. Ngo, a self-described "activist against communism" known in the local Vietnamese-American community for his "constant appearances on . . . media channels since 1984," spoke these words to inform voters in the Vietnamese American community before they considered voting for Ted Bui. According to Ngo, they needed to know whether Ted Bui would "serve the

20

interest[s] of the Vietnamese American refugee community when it [came] to [their] fight[] against human rights violations in Vietnam and against the Vietnam [C]ommunist organization affecting [their] political views."

The overall gist of these statements, taken in the context in which they were made, is that plaintiff, her father, and her entire family are members or supporters of the Vietnamese Communist Party. This is a factual assertion capable of being proven true or false. (See *Gertz, supra*, 418 U.S. at pp. 326, 339-342 [implicitly finding statements that person was a "a 'Leninist,'" "a 'Communist-fronter,'" and an officer of a communist organization were actionable factual assertions]; *Summit Bank, supra,* 206 Cal.App.4th at p. 696 [expression of opinion that implies false assertion of fact is actionable]; *Buckley v. Littell* (2d Cir. 1976) 539 F.2d 882, 894 [allegations of membership in, or well-defined political affiliation with, Communist party "are readily perceivable as allegations of fact susceptible to proof or disproof of falsity"].)

Contrary to defendants' assertion, the statements are not protected expressions of opinion. The context in which they were made evidences an attempt by Ngo to provide his audience with a fact which, if believed, would be of significant import to many Vietnamese-American voters. (See *Bently Reserve LP v. Papaliolios* (2013) 218 Cal.App.4th 418, 427 [knowledge and understanding of audience targeted by publication must be considered].) This is underscored by Ngo's simultaneous effort to persuade viewers that the information he was conveying was true: "Is that Lan Vu? Lan Vu, something [sic] Vu Lan, daughter of a Communist colonel. Here, look at see the picture, folks. When we say something we do have proofs [*sic*]." A reasonable fact finder could conclude the offering of "proof" suggests facts, not opinions, are being communicated. (See *id.* at pp. 428-429.)

Similarly, the context and the precise words used would not lead a reasonable listener to perceive the comments as rhetorical hyperbole. (C.f. *Hoang, supra*, 60 Cal.App.5th at p. 534 [describing someone as a "crook" and "pettily cunning" is

21

nonactionable rhetorical hyperbole]; *Seelig v. Infinity Broadcasting Corp.* (2002) 97 Cal.App.4th 798, 810-811 ["local loser," "chicken butt," and "big skank" were "school yard taunt" and nonactionable rhetorical hyperbole]; *Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1404 ["creepazoid attorney" and "loser wannabe lawyer" were nonactionable rhetorical hyperbole].)

Turning to falsity of the factual statements, we assume without deciding that plaintiff bears the ultimate burden in this case of demonstrating falsity (see *Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 373-375), and conclude she met her anti-SLAPP burden on the issue. In a declaration, she stated the person in the picture was not her father, her father was never in the military, and she had "never participated in, [been] involved with, or supported the Communist party." Such a showing was sufficient at this stage in the litigation. (See *Billauer, supra*, 88 Cal.App.5th at p. 962 [evidence of party opposing anti-SLAPP motion must be accepted as true].)

C.       *Publication with a Natural Tendency to Injure*

There is no dispute defendants "published" the alleged defamatory statements, as that term is used in the defamation arena. (*Sanchez v. Bezos* (2022) 80 Cal.App.5th 750, 763 [publication means communication to third party who understands defamatory meaning of statement and its application to person to whom reference is made].) And, understandably, no one contends a charge of membership in the Vietnamese Communist Party presented to members of the local Vietnamese-American community would not have a natural tendency to injure. (See *MacLeod v. Tribune Publishing Co.* (1959) 52 Cal.2d 536, 546 ["Whatever the rule may have been when anticommunist sentiment was less crystallized than it is today [citations] . . . a charge of membership in the Communist Party or communist affiliation or sympathy is libelous on its face"]; *Lam v. Ngo* (2001) 91 Cal.App.4th 832, 850-851 ["the word 'Communist' has some real sting in the Vietnamese community in Orange County, California" because many of those people have actually lived under Communist regime].)

22

D.      *Negligence*

In *Gertz*, the United States Supreme Court held that states could define the standard of liability for defamation of private individuals, so long as the states did not impose liability without fault.  (*Gertz, supra*, 418 U.S. at p. 347.)  Consistent therewith, our state high court later confirmed that negligence is the standard in California.  (*Comedy III Productions, Inc. v. Gary Saderup, Inc.* (2001) 25 Cal.4th 387, 398; *Khawar, supra,* 19 Cal.4th at p. 274; *Brown v. Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 742.)  Thus, a private person seeking to recover for defamation must demonstrate the defendant failed to exercise reasonable care in determining the truth or falsity of the alleged defamatory statement before publishing it.  (See *Hecimovich v. Encinal School Parent Teacher Organization* (2012) 203 Cal.App.4th 450, 470; *Carney v. Santa Cruz Women Against Rape* (1990) 221 Cal.App.3d 1009, 1016.)

Plaintiff's complaint alleged defendants "failed to use reasonable care to determine the truth or falsity of [the] statements before making them."  Although none of the evidence she submitted in opposition to defendants' motion supported that allegation, evidence supplied by defendants did.  Ngo relayed in his declaration that the photos and video on which defendants relied in making their comments came from another person's Facebook post.  There is no indication defendants performed any due diligence before using them to comment about plaintiff and her family.  Quite the opposite, it appears they learned the pitfalls of blind reliance on a social media post when the original poster contacted Ngo a few weeks after the YouTube broadcast to clarify that the person depicted in the photos was plaintiff's uncle, not her father, and that he had dubbed in the communist music to the video.  The evidence was sufficient to demonstrate minimal merit on the issue of defendants' negligence.

E.      *Unprivileged*

Defendants contend they are immune from defamation liability pursuant to a provision of federal law — section 230 — because they simply republished something

23

that already existed on social media. We disagree, as the record does not evidence defendants simply republished defamatory content created by a third party.

"In the Communications Decency Act of 1996, Congress declared: 'No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.' [Citation] 'No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.' [Citation]." (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 39 (*Barrett*), fn. omitted, citing § 230, subds. (c)(1) & (e)(3).)

Although "[t]hese provisions have been widely and consistently interpreted to confer broad immunity against defamation liability for those who use the Internet to publish information that originated from another source" (*Barrett, supra*, 40 Cal.4th at p. 39), there are recognized outer bounds of such immunity. (See *Fair Housing Council of San Fernando Valley v. Roommates.Com, LLC* (9th Cir. 2008) 521 F.3d 1157, 1164 (*Roommates*) [§ 230 does not "create a lawless no-man's-land on the Internet"].) Of relevance here, the immunity extends only to someone who acts as a conduit of defamatory content created or developed by a third party, not someone who creates or develops the defamatory content themselves. (See *Barrett,* at pp. 62-63; *Phan v. Pham* (2010) 182 Cal.App.4th 323, 328 (*Phan*); *Roommates,* at pp. 1162, 1167-1168.)

Defendants' misstep is in failing to appreciate the original source of the alleged defamatory content in this case. The Facebook post on which they based their YouTube commentary is not in the record. What is in the record is a declaration by Ngo conveying the Facebook post contained certain pictures and a video. Plaintiff's defamation claim is not grounded in those depictions. Rather, it is aimed at extrapolations about plaintiff made by defendants after viewing the photos and video. As the creators of the alleged defamatory content, defendants fall outside the protections of section 230. (See *Liapes v. Facebook, Inc.* (2023) 95 Cal.App.5th 910, 928 [§ 230 does not protect person who creates defamatory content]; *La Liberte v. Reid* (2d Cir. 2020) 966

24

F.3d 79, 89-90 [concluding § 230 protection did not apply because social media content alleged to be defamatory was not simply repetition or sharing of content created by another]; cf. *Phan, supra*, 182 Cal.App.4th at p. 328 [concluding § 230 protection applied because plaintiff simply forwarded alleged defamatory e-mail with no material contribution to its substance].)

## DISPOSITION

The judgment is reversed. On remand, the trial court is directed to strike its order granting defendants' anti-SLAPP motion, and to enter a new order denying such motion with respect to plaintiff's defamation claim and granting it with respect to plaintiff's claims for intentional and negligent infliction of emotional distress. Plaintiff is entitled to costs on appeal.


DELANEY, J.

WE CONCUR:


SANCHEZ, ACTING P. J.


MOTOIKE, J.

25